J-S12018-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: A.L., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: L.L., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 4 EDA 2022 |

Appeal from the Order Entered November 30, 2021
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-DP-0002397-2014

| | | |
|---|---|---|
| IN THE INTEREST OF: A.A.L.-W., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: L.L., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 5 EDA 2022 |

Appeal from the Decree Entered November 30, 2021
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-AP-0000221-2021

| | | |
|---|---|---|
| IN THE INTEREST OF: B.L., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: L.L., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 6 EDA 2022 |

Appeal from the Order Entered November 30, 2021
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-DP-0001506-2017

| | | |
|---|---|---|
| IN THE INTEREST OF: B.M.A.L., A MINOR | : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: L.L., MOTHER | : : : : : : : | |
| | : | No. 7 EDA 2022 |

Appeal from the Decree Entered November 30, 2021
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-AP-0000222-2021

BEFORE: BENDER, P.J.E., BOWES, J., and DUBOW, J.

MEMORANDUM BY BOWES, J.: **FILED JUNE 10, 2022**

L.L. ("Mother") appeals from the November 30, 2021 decrees that terminated involuntarily her parental rights to A.L., born in August 2012, and B.L., born in January 2017,[1] as well as the orders entered the same date that changed each child's permanent placement goal to adoption.[2] We affirm.

We glean the following from the record. Mother has a long history with the Philadelphia Department of Human Services ("DHS"). DHS first became involved with the family in 2005 due to neglect and abuse of older siblings of A.L. and B.L. and, *inter alia*, parental substance abuse and housing concerns.

---

[1] The captions alternatively refer to the children, respectively, by the initials A.A.L.-W. and B.M.A.L. We use A.L. and B.L. within this memorandum.

[2] The trial court also entered separate decrees terminating the rights of each child's biological or putative father. No father has participated in Mother's appeal or filed his own appeal. This Court consolidated Mother's appeals *sua sponte*.

In mid-2014, DHS reengaged due to Mother's substance abuse and lack of housing. DHS obtained an order of protective custody, removed A.L. from Mother's care, and placed A.L. in kinship care. Shortly thereafter, the court adjudicated A.L. dependent. At the time of B.L.'s birth in January 2017, A.L. remained dependent and out of Mother's care.

When B.L. was four months old, she suffered severe burns on her body. Mother failed to obtain prompt medical care and when she did seek care, hospital staff disbelieved Mother's account that B.L. was briefly exposed to hot water. Given the extent and severity of her burns, staff determined that B.L. had to have had prolonged exposure to hot water. Furthermore, the staff were concerned about Mother's lack of cooperation with B.L.'s treatment and signs of intoxication. Upon B.L.'s discharge, DHS obtained an order of protective custody, removed B.L. from Mother's care, and placed B.L. in kinship care. The court subsequently adjudicated B.L. dependent.

In August 2018, the court returned A.L. and B.L. to Mother's custody. It continued to oversee B.L.'s dependency case until the court closed it in March 2019, and A.L.'s dependency case until the court closed it in June. Reunification was short-lived. In August 2019, DHS learned that Mother had left A.L. and B.L. with their maternal grandmother for about six weeks with no contact. When DHS went to Mother's home, staff observed that Mother appeared to be either under the influence of a substance or suffering from poor mental health. Therefore, DHS obtained an order of protective custody

to remove A.L. and B.L. from the home where they had been staying, which, as a result of Mom banging on the side of the house and the vehicle of DHS staff, required police assistance. DHS placed A.L. and B.L. in separate foster homes.[3] In September 2019, the court adjudicated A.L. and B.L. dependent.

The court ordered Mother to undergo a dual diagnosis (*i.e.*, substance abuse and mental health) assessment, provide urinalysis, abide by DHS's single case plan objectives, and provide proof of income. It granted her supervised visitation at DHS. DHS's objectives for Mother included stabilizing her mental health, addressing her substance abuse, providing appropriate housing, strengthening and maintaining her bond with A.L. and B.L., and enhancing her parental capacities.

On April 21, 2021, DHS filed a petition to terminate involuntarily Mother's parental rights to A.L. and B.L. pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), (8), and (b). It also filed petitions seeking to change the permanency goal for A.L. and B.L. from reunification to adoption.

The trial court conducted a joint hearing on DHS's petitions on November 30, 2021.[4] DHS presented the testimony of Aaron Redd, who

---

[3] At the time of the termination and goal change hearings, A.L. resided in a pre-adoptive foster home. B.L.'s foster home was not pre-adoptive but, as discussed *infra*, both children had an alternate adoptive resource potentially available via an adult sibling.

[4] At the time of the hearing, A.L. was nine and B.L. was four. Daniel Kurland, Esquire, represented A.L. and B.L. as guardian *ad litem*, while Linda Walters,
*(Footnote Continued Next Page)*

worked as a case manager at the Community Umbrella Agency ("CUA") assigned to the family. Mother arrived late to the hearing after Mr. Redd concluded his testimony. Mother then testified on her own behalf. At the conclusion of the hearing, the court entered decrees involuntarily terminating Mother's parental rights under all subsections pleaded, as well as separate orders changing the permanency goals to adoption.

Mother timely filed the instant notices of appeal from the termination decrees and goal change orders concurrently with concise statements of matters complained of on appeal. The trial court issued an opinion pursuant to Pa.R.A.P. 1925(a). In her appeals from the termination decrees, Mother raises identical issues for each child as follows:

1. Did the trial court err as a matter of law or abused [*sic*] its discretion where it determined that the requirements of 23 Pa.C.S.[ §] 2511(a) to terminate [Mother's] parental rights were met?

2. Did the trial court err as a matter of law or abused [*sic*] its discretion where it determined the requirements of 23 Pa.C.S.[ §] 2511(b) were met?

Mother's brief (5 EDA 2022) at 3; Mother's brief (7 EDA 2022) at 3. As to the dependency orders, Mother raises the following identical issue for each child:

1. Did the trial court err as a matter of law or abused [*sic*] its discretion where it determined that the permanency goal for [A.L. and B.L.] should be changed to adoption?

---

Esquire, represented them as legal counsel. Attorney Kurland's appointment as legal counsel ended following the hearing. We note with displeasure that Attorney Walters has not filed a brief on behalf of A.L. and B.L. on appeal.

Mother's brief (4 EDA 2022) at 3; Mother's brief (6 EDA 2022) at 3.

We begin with Mother's appeals from the decrees terminating her parental rights, which we review mindful of our well-settled standard of review. "In cases concerning the involuntary termination of parental rights, appellate review is limited to a determination of whether the decree of the termination court is supported by competent evidence." *In re Adoption of C.M.*, 255 A.3d 343, 358 (Pa. 2021). When applying this standard, the appellate court must accept the trial court's findings of fact and credibility determinations if they are supported by the record. *Interest of S.K.L.R.*, 256 A.3d 1108, 1123 (Pa. 2021). "Where the trial court's factual findings are supported by the evidence, an appellate court may not disturb the trial court's ruling unless it has discerned an error of law or abuse of discretion." *In re Adoption of L.A.K.*, 265 A.3d 580, 591 (Pa. 2021).

"[A]n abuse of discretion does not result merely because the reviewing court might have reached a different conclusion" or "the facts could support an opposite result." *In re Adoption of S.P.*, 47 A.3d 817, 826-27 (Pa. 2012). Instead, an appellate court may reverse for an abuse of discretion "only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will." *Id.* at 826. This standard of review reflects the deference we pay to trial courts, who often observe the parties first-hand across multiple hearings. *Interest of S.K.L.R.*, *supra*, at 1123-24.

In considering a petition to terminate parental rights, a trial court must balance the parent's fundamental "right to make decisions concerning the care, custody, and control" of his or her child with the "child's essential needs for a parent's care, protection, and support." **C.M.**, **supra**, at 358. The moving party must establish the statutory grounds by clear and convincing evidence, which is evidence that is so "clear, direct, weighty, and convincing as to enable a trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." **Id**. at 359 (citation omitted).

Termination of parental rights is governed by § 2511 of the Adoption Act and requires a bifurcated analysis. "Subsection (a) provides eleven enumerated grounds describing particular conduct of a parent which would warrant involuntary termination." **Id**.; **see also** 23 Pa.C.S. § 2511(a)(1)-(11). In evaluating whether the petitioner proved grounds under § 2511(a), the trial court must focus on the parent's conduct and avoid using a "balancing or best interest approach." **Interest of L.W.**, 267 A.3d 517, 524 n.6 (Pa.Super. 2021). If the trial court determines the petitioner established grounds for termination under § 2511(a) by clear and convincing evidence, the court then must assess the petition under § 2511(b), which focuses on the child's needs and welfare. **In re T.S.M.**, 71 A.3d 251, 267 (Pa. 2013).

This Court need only agree with any one subsection of § 2511(a), in addition to § 2511(b), to affirm the termination of parental rights. **See In re**

***B.L.W.***, 843 A.2d 380, 384 (Pa.Super. 2004) (*en banc*). We focus our analysis on § 2511(a)(8) and (b), which provide as follows:

> **(a) General Rule**.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
>> (8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.
>
> . . . .
>
> **(b) Other considerations**.—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511.

To satisfy § 2511(a)(8), the petitioner must show three components: (1) that the child has been removed from the care of the parent for at least 12 months; (2) that the conditions which led to the removal or placement of the child still exist; and (3) that termination of parental rights would best serve the needs and welfare of the child. ***In re Adoption of J.N.M.***, 177 A.3d 937, 943 (Pa.Super. 2018).

Unlike other subsections, § 2511(a)(8) does not require the court to evaluate a parent's willingness or ability to remedy the conditions that led to the placement of the children. *In re M.A.B.*, 166 A.3d 434, 446 (Pa.Super. 2017). "[T]he relevant inquiry" regarding the second prong of § 2511(a)(8) "is whether the conditions that led to removal have been remedied and thus whether reunification of parent and child is imminent at the time of the hearing." *In re I.J.*, 972 A.2d 5, 11 (Pa.Super. 2009). Further, the Adoption Act prohibits the court from considering "any efforts by the parent to remedy the conditions described [in the petition] which are first initiated subsequent to the giving of notice of the filing of the petition." 23 Pa.C.S. § 2511(b).

Although § 2511(a) generally focuses on the behavior of the parent, the third prong of § 2511(a)(8) specifically "accounts for the needs of the child." *In re C.L.G.*, 956 A.2d 999, 1008-09 (Pa.Super. 2008) (*en banc*). This Court has recognized "that the application of [§ 2511(a)(8)] may seem harsh when the parent has begun to make progress toward resolving the problems that had led to the removal of her children." *In re Adoption of R.J.S.*, 901 A.2d 502, 513 (Pa.Super. 2006).

> However, by allowing for termination when the conditions that led to removal of a child continue to exist after a year, the statute implicitly recognizes that a child's life cannot be held in abeyance while a parent attempts to attain the maturity necessary to assume parenting responsibilities. The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future. Indeed, we work under statutory and case law that contemplates only a short period of time, to wit [18] months, in which to

complete the process of either reunification or adoption for a child who has been placed in foster care.

*Id*.

In her briefs, Mother concedes the first prong, *i.e.*, that A.L. and B.L. have been removed from her care more than one year. Mother's brief (5 EDA 2022) at 17; Mother's brief (7 EDA 2022) at 17. Instead, she focuses on the second prong, arguing she has eliminated the conditions that led to the removal of A.L. and B.L. Mother's brief (5 EDA 2022) at 18; Mother's brief (7 EDA 2022) at 18. According to Mother, she has completed parenting classes, is in therapy and prescribed medication, has obtained housing, and is employed. *Id*.

Mother's argument suffers from a major flaw in that it is based solely upon her testimony, which the trial court rejected as incredible. *See* Trial Court Opinion, 2/7/22, at 13. The trial court credited the testimony of Mr. Redd, who painted a different picture. *Id*. at 19. Under our standard of review, we must defer to the trial court's credibility determinations if they are supported by the record. *Interest of S.K.L.R.*, *supra*, at 1123-24.

According to Mr. Redd, Mother has made no progress towards alleviating the conditions that led to the removal of A.L. and B.L. from Mother's care. N.T., 11/30/21, at 17-18. Through DHS's extensive history with Mother, she has struggled with substance abuse. The second removal of A.L. and B.L. occurred after Mother abandoned them with her mother and neglected their needs. *Id*. at 11. When DHS located Mother, she displayed aggressive

- 10 -

behavior indicative of mental health instability or a lack of sobriety. Although the court ordered her at every permanency review hearing to undergo a substance abuse assessment and urinalysis, Mother never complied. *Id*. at 12-13, 28. Additionally, despite Mother's claim that she was attending weekly mental health therapy, she did not provide documentation when CUA asked her to substantiate her attendance. *Id*. at 13, 50. She also revoked a release that previously permitted CUA to obtain information directly from the provider. *Id*. at 13. The information CUA had obtained from the provider prior to Mother's revocation was that Mother merely had a medical case manager, who recommended that Mother enroll in more intensive outpatient services. *Id*.

Despite Mother's assertion to the contrary, DHS was unable to verify she had housing. During the dependency cases, Mr. Redd assessed one home, which he found inappropriate for reunification with A.L. and B.L. *Id*. at 14. Mother later provided DHS with another address, and Mr. Redd conducted "pop up" visits at that address in August 2021. However, he observed no signs of Mother living there. *Id*. In September 2021, Mother told DHS she moved from Philadelphia to Harrisburg for a month, but never provided a new address to DHS when she returned to Philadelphia. *Id*. at 14-15.

Mr. Redd acknowledged Mother's completion of a parenting program early in the case. *Id*. at 16. Despite this, Mother has not progressed past supervised visitation with A.L. and B.L. Her visits originally occurred at DHS. At one point, the court permitted one of the foster parents to supervise the

visits in the community. *Id*. During those visits, Mother "had a lot of argumentative, and bickering moments, and angry outburst[s] with other individuals in the area, as well as staff during those visits, making it unsafe for [A.L. and B.L.] to be there." *Id*. At the August 30, 2021 permanency review hearing, the court ordered Mother's visits to return to DHS under supervision. *Id*. at 16. Despite being permitted to visit every other week, Mother only attended two visits between August 30 and November 30, 2021, both of which occurred in November. *Id*. Mother displayed angry outbursts toward staff and A.L.'s foster parent at the first visit and hit A.L. at the second visit because A.L. "didn't tell her what she wanted to hear." *Id*. at 17.

Based upon these facts, we discern no abuse of discretion or error of law in the trial court's crediting of Mr. Redd's testimony and the conclusion that the conditions leading to the removal of A.L. and B.L. continued to exist more than twelve months after their removal. In fact, although Mother apparently made enough progress in the past to achieve reunification, the same recurring issues of substance abuse, unstable mental health, and housing transience have plagued her throughout the lives of A.L. and B.L. She has not been able to achieve sustained stabilization.

Likewise, we discern no abuse of discretion or error of law in the trial court's conclusion that termination best served the welfare of A.L. and B.L. pursuant to § 2511(a)(8). A.L. has spent six years of her life in foster care – from ages two to six, then again from ages seven to nine. B.L. has spent over

three years in foster care. Thus, the court was well within its discretion to prioritize the needs for permanency and stability of A.L. and B.L. over Mother's claim she was ready for reunification. *See R.J.S.*, *supra*, at 513.

Having determined that DHS met its burden under § 2511(a), the court then turned to § 2511(b), which required the court to "give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b). "The emotional needs and welfare of the child have been properly interpreted to include intangibles such as love, comfort, security, and stability." *T.S.M.*, *supra*, at 267 (cleaned up). Our Supreme Court has made clear that § 2511(b) requires the trial court to consider the nature and status of bond between a parent and child. *In re E.M.*, 620 A.2d 481, 484-85 (Pa. 1993). Nevertheless, "the mere existence of a bond or attachment of a child to a parent will not necessarily result in the denial of a termination petition." *T.S.M.*, *supra*, at 267. In evaluating a parent-child bond, the court does not have to use expert testimony, and it may rely upon the testimony of social workers and caseworkers. *In re Z.P.*, 994 A.2d 1108, 1121 (Pa.Super. 2010). To the extent there is a bond, the trial court must examine whether termination of parental rights will destroy a "necessary and beneficial relationship," thereby causing a child to suffer "extreme emotional consequences." *E.M.*, *supra*, at 484-85.

"While a parent's emotional bond with his or her child is a major aspect of the [§] 2511(b) best-interest analysis, it is nonetheless only one of many

- 13 -

factors to be considered by the court when determining what is in the best interest of the child." *In re M.M.*, 106 A.3d 114, 118 (Pa.Super. 2014). "In addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent." *Id*. In determining needs and welfare, the court may properly consider the effect of the parent's conduct upon the child and consider "whether a parent is capable of providing for a child's safety and security or whether such needs can be better met by terminating a parent's parental rights." *L.W.*, *supra*, at 524.

Furthermore, our Supreme Court has stated, "[c]ommon sense dictates that courts considering termination must also consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents." *T.S.M.*, *supra*, at 268. The Court directed that, in weighing the bond considerations pursuant to § 2511(b), "courts must keep the ticking clock of childhood ever in mind." *Id.* at 269. The *T.S.M.* Court observed, "[c]hildren are young for a scant number of years, and we have an obligation to see to their healthy development quickly. When courts fail . . . the result, all too often, is catastrophically maladjusted children." *Id.*

In the instant case, Mother makes two primary arguments concerning the needs and welfare of A.L. and B.L. We address each *seriatim*. First, Mother claims terminating her rights does not serve the needs and welfare of

A.L. and B.L because she has a strong bond with them. Mother's brief (5 EDA 2022) at 22; Mother's brief (7 EDA 2022) at 22.[5] Specifically, she asserts she has visited when she could and has taken an active interest in them. *Id*.

The trial court found DHS met its burden in establishing that terminating Mother's parental rights best served the needs and welfare of A.L. and B.L. Specifically, Mother's "noncompliance" with services meant to rectify her issues, combined with her "lack of participation in supervised visits" and "problematic behavior" during the visits she did attend, resulted in her failure to establish a "healthy beneficial parental bond" with A.L. or to create any bond at all with B.L. Trial Court Opinion, 2/7/22, at 26.

The trial court based its conclusions upon the testimony of Mr. Redd. Regarding A.L., Mr. Redd testified that A.L. recognizes Mother as her parent, but there is "no significant bond between them as [Mother] has not really been around most of [A.L.'s] life" or been a "parental figure for her." N.T., 11/30/21, at 19. In his view, terminating Mother's parental rights would not result in "irreparable harm" to A.L. and would provide her "a better option for growth and prosperity within her life." *Id*.

---

[5] We observe that Mother's counsel has inexplicably included a paragraph within this argument concerning "Father," "S.S.," and a different CUA caseworker, as well as quotations attributed to a trial court opinion that do not appear within the underlying trial court opinion. *See* Mother's brief (5 EDA 2022) at 21-22; Mother's brief (7 EDA 2022) at 21-22.

Regarding B.L., Mr. Redd testified that there is no parent/child bond because B.L. has spent most of her life out of Mother's care. *Id*. at 31. During her visits with Mother, B.L. spent most of the time interacting with her siblings, not Mother. *Id*. at 30. Mr. Redd viewed termination of Mother's rights as the outcome most supportive of B.L.'s best interests so that B.L. could seek long-term permanency in a home where she can grow and prosper. *Id*. at 31-32.

In support of her argument that A.L. and B.L. have an "extensive bond" with her, Mother emphasizes that "even Mr. Redd testified that the conversation with the [c]hildren about not seeing their mother would be so hard on them that he didn't even bother to have that conversation." Mother's brief (5 EDA 2022) at 22-23; Mother's brief (7 EDA 2022) at 22-23. She claims that because Mr. Redd knew the news would "upset" them, particularly A.L., the trial court abused its discretion in finding termination of Mother's rights best served the children's needs and welfare. Mother's brief (5 EDA 2022) at 22; Mother's brief (7 EDA 2022) at 22.

It appears that Mother is referring to the following exchange between Mr. Redd and Mother's counsel at the termination hearing:

> [Mother's counsel:] [W]hen you discussed it with [A.L.], did you explain to her that she would no longer be able to visit with [Mother] if [Mother's] rights were terminated?
>
> [Mr. Redd:] As I have not discussed with [A.L.], no. Again, the question would be, "Would you be okay with staying with the individual long time [*sic*]?" Reporting to [A.L.] that she can't see her mommy anymore would

- 16 -

probably cause a lot of issues between me and her, and I don't want to cause that between her and me. I like to keep it as positive as possible. But she is aware that she would not be going back to her mom, and she is okay with going with her sister or staying with her current foster parent.

[Mother's counsel:] Does she look forward to visits with her mom?

[Mr. Redd:] No.

[Mother's counsel:] Will she be upset if she's no longer able to visit with her mom?

[Mr. Redd:] That's unknown at this time. Her last visit, she didn't even want to attend.

N.T., 11/30/21, at 27.

Mr. Redd's testimony illustrates nothing more than his reluctance to tell A.L. that she may not see Mother anymore.[6] His statement does not relate to B.L. whatsoever, despite Mother's attempt to lump the children together. Moreover, Mother's counsel did not ask Mr. Redd to elaborate on what type of issues he thought it would cause A.L.

Even if we inferred, as Mother does, that Mr. Redd did not want to tell A.L. that visits would cease because he thought it would upset her, that does

---

[6] As we mentioned, the court did appoint legal counsel to represent A.L. Attorney Walters determined based on her conversations with A.L. that she does not understand the differences between adoption and legal custody, but Attorney Walters was able to discern some preferences from A.L. N.T., 11/30/21, at 62-63. Attorney Walters reported that A.L. is close with her teenage sister A.L.-W., who is in treatment-level foster care. *Id*. at 62-64, 71. According to Attorney Walters, A.L. wishes to be with her sister A.L.-W. and does not prefer to stay at her foster home. *Id*. at 63.

- 17 -

not establish *a fortiori* that the trial court erred or abused its discretion in terminating her parental rights. The standard is not whether A.L. would be upset. Many children, even those with only a minimal bond with a parent, would be upset upon learning that they may not see a parent anymore. **See T.S.M.**, **supra**, at 267 (noting "it is 'an immutable psychological truth' that 'even the most abused of children will often harbor some positive emotion towards the abusive parent'") (citing **In re K.K.R.-S.**, 958 A.2d 529, 535 (Pa.Super. 2008). Instead, the court was tasked with considering whether A.L.'s relationship with Mother was so necessary and beneficial to her that she would suffer extreme emotional consequences if the court terminated Mother's parental rights. **See E.M.**, **supra**, at 484-85. Nothing in the record suggests after spending six years in foster care over two periods of her life that A.L. would suffer this level of harm from terminating Mother's parental rights.

In her second argument, Mother maintains that terminating her rights does not serve the needs and welfare of A.L. and B.L. because their foster parents are not meeting their needs. Mother's brief (5 EDA 2022) at 19, 23; Mother's brief (7 EDA 2022) at 19, 23. Specifically, Mother claims A.L.'s foster parent is neglecting her educational needs and mental health because her individual education plan ("IEP") was "not up to date" and A.L. is eligible for in-home services but not receiving them. **Id**. She makes a similar claim regarding B.L.'s mental health, assailing her foster parent's declination to take

B.L. to a behavioral program recommended by the Children's Hospital of Philadelphia because it was too far away. *Id*.

Contrary to Mother's argument, Mr. Redd specifically testified that A.L.'s IEP is up to date and accounts for her needs. N.T., 11/30/21, at 36. The problem with the IEP was not that it was out of date, but that A.L.'s school had not been providing her with the speech and occupational therapies she is supposed to receive in accordance with the IEP. *Id*. Mr. Redd acknowledged this and stated that "we're working with the school to get that rectified." *Id*.

Mr. Redd also described A.L.'s mental health needs and her difficulties with impulse control. *Id*. at 37. To assist with this, she was taking Adderall on a trial basis and was awaiting the next available re-evaluation appointment to determine whether that was the most appropriate medication. *Id*. at 36-37. While Mother is correct that A.L. was not receiving behavioral health support at the time of the hearing, A.L.'s foster parent and Mr. Redd were "working diligently" on finding A.L. a therapeutic support staff worker since the organization where she had been receiving services had no available staff. *Id*. at 37.

Turning to B.L., she attends a Head Start educational program. *Id*. The school referred B.L. to a behavioral program due to her behaviors in school. *Id*. Mr. Redd explained her "foster parent was unable to make that travel to that location" and he is exploring other places for "childhood therapy or programs." *Id*. Like her argument regarding A.L., Mother urges us to make

inferences that are not warranted by the sparse information in the record. The record contains no details on the location of the program, whether the foster parent's declination was reasonable, how long B.L. has been without assistance, or the nature of B.L.'s behaviors.

Moreover, Mother's critiques of the care A.L. and B.L were receiving in foster care ignores that one of her own goals for reunification was ensuring that the educational and mental health needs of A.L. and B.L. were being met, yet she provided no testimony on any attempts she made to address their needs. Instead, Mother claimed Mr. Redd would not provide her information regarding the children's education and behavioral health. However, the court did not find Mother's description of her relationship with Mr. Redd to be credible. *See* Trial Court Opinion, 2/7/22, at 13. According to Mr. Redd, A.L.'s relationship with her foster parent is "very positive." N.T., 11/30/21, at 20. The foster parent, who is part of an organization called Turning Points for Children and Specialized Behavioral Health Foster Care, provides a "very structured environment" in which A.L. is "doing very well." *Id*. at 18. Previously, A.L. was very dependent, but the foster parent is teaching A.L. independent skills. *Id*. A reward system used by the foster parent has helped significantly decrease A.L.'s temper tantrums. *Id*. Her family goes on a lot of outings, such as the circus, and A.L. is "pretty happy." *Id*. at 29-30. Additionally, while previous foster and kinship parents failed to recognize or obtain help for A.L.'s struggles with reading, since she has been in her current

foster home, she has made educational progress. *Id*. B.L.'s foster parent is meeting her safety, medical, dental, and vision needs. *Id*. at 33.

DHS is also exploring an adult sibling of A.L. and B.L. as an adoptive placement; this sibling lives in Delaware and is participating in the Interstate Compact on the Placement of Children process. *Id*. The adult sibling is an adoptive resource for both A.L. and B.L. and currently visits with one or more of the siblings at least once a month at her home in Delaware. *Id*. at 26.

We defer to the court's assessment of Mr. Redd's credibility as it is supported by the record. A.L. and B.L. have high level of needs, and Mr. Redd testified he is working with their foster parents and other resources to ensure those needs can be met long-term. The court was within its discretion to conclude that Mother is not able to meet the needs and welfare of A.L. and B.L. and that terminating her rights best serves their needs and welfare. Accordingly, no relief is due with respect to the termination decrees.

Finally, we turn to Mother's appeals from the goal change orders, which we review for an abuse of discretion. *In re R.J.T.*, 9 A.3d 1179, 1190 (Pa. 2010). When considering a goal change petition, "[t]he best interests of the child, and not the interests of the parent, must guide the trial court. As this Court has held, a child's life simply cannot be put on hold in the hope that the parent will summon the ability to handle the responsibilities of parenting." *In re A.B.*, 19 A.3d 1084, 1089 (Pa.Super. 2011) (citations and quotation marks omitted). Stated succinctly, given Mother's continued struggles with

instability in her own life, the sheer amount of time A.L. and B.L. have spent in foster care, and the need for A.L. and B.L. to achieve stability in their own lives, the court's decision to change the permanency goal was well within its discretion.

Based on the foregoing, we affirm the decrees terminating Mother's parental rights and the orders changing the permanency goals to adoption.

Decrees affirmed. Orders affirmed.

Judge Dubow did not participate in the consideration or decision of this case.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: <u>6/10/2022</u>